**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DIAMOND TRIUMPH AUTO | : | No. 3:02cv514 |
| GLASS, INC., | : | |
| Plaintiff | : | (Judge Munley) |
| v. | : | |
| | : | |
| SAFELITE GLASS CORPORATION, | : | |
| Defendant | : | |

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## MEMORANDUM

Presently before the court for disposition is Defendant Safelite Glass Corporation's motion for summary judgment.  Additionally, Plaintiff Diamond Triumph Auto Glass, Inc. has moved for summary judgment on Safelite's counterclaims.  These matters have been fully briefed and are ripe for disposition.  For the reasons that follow, we will grant each motion in part and deny each in part.

**I.    Background**

Diamond and Safelite are competing glass companies.  They each repair and replace damaged vehicle glass.  A significant portion of the glass business involves providing services for insured individuals.  This case involves the arrangements between Diamond, Safelite, and the insurance companies.

In addition to repairing and replacing damaged automobile glass, Safelite acted as the automobile glass claims administrator for more than 100 insurance companies from January 1, 1999 through June 30, 2004.  (Def. Ex. 89 in Supp. Summ. J., Taghvai Aff. ¶¶ 3-4; Ex. 132 in Supp. Summ. J., O'Mara Aff. ¶¶ 4.)  These companies entered into service agreements

with Safelite to outline and control the scope of Safelite's services.  (Def. Ex. 89 in Supp.

Summ. J., Taghvai Aff. ¶¶ 4-5.)  These services included:

> a) leasing and maintaining a telephone number or numbers dedicated to the
> insurance company's auto glass claims;
> b) maintaining call centers staffed with operators to answer agent,
> policyholder, and insurance company calls to the line maintained for the client,
> usually on a 24 hour per day, seven day per week basis;
> c) answering questions regarding coverage and confirming coverage for agents
> and policyholders;
> d) taking information regarding the auto glass claim, including the name and
> contact details for the policyholder, the details of the vehicle and glass part
> involved, and other relevant information;
> e) answering policy questions;
> f) administering a pre-established and pre-approved script to guide the call
> center employee's conversations with policyholders;
> g) assisting the policyholder in scheduling his vehicle with a glass provider;
> and
> h) handling and paying the invoice submitted by the auto-glass company,
> including a review of the amounts charged to reconcile them with the amounts
> authorized for payment by the insurance company.

(Def. Ex. 132 in Supp. Summ. J., O'Mara Aff. ¶4.)

In the service agreements, each insurance company and Safelite agreed to a maximum

price for each glass claim.  (Def. Ex. 89.1 in Supp. Summ J., SAFE31G000007 ¶ 1.5.)  This

price is referred to as the "reasonable and customary price" or "fair market value" price.

(Def. Ex. 89.1 in Supp. Summ J., SAFE31G000040 ¶ 4.)  In addition to guaranteeing its

pricing, Safelite agreed to warranty its products and service.  (Def. Ex. 89.1 in Supp. Summ

J., SAFE31G000012 ¶ 2.8.)  The service agreements also required that Safelite and the

insurance companies jointly develop scripts to guide the call center employees who handled

policyholders' initial calls, known as first notice of loss (FNOL) calls.  (Def. Ex. 89.1 in

2

Supp. Summ J., SAFE31G000009 ¶ 2.2(b).)

The service agreements did not require that Safelite shops replace the glass for every claimant, but provided that Safelite would refer some claims to other shops.  (Def. Ex. 89.1 in Supp. Summ. J., SAFE31G000040 ¶ 2; Def. Ex. 89.1 in Supp. Summ J., SAFE27B000105 ¶ 2.6. )  Thus, Safelite developed a referral network of third party glass providers ("the network.").  (Def. Ex. 131 in Supp. Summ. J, Kipker Aff. ¶ 4-5.)  Glass companies wishing to join Safelite's network signed contracts called Network Affiliate Participation Agreements, which required that the shops perform work at or below the reasonable and customary prices and meet certain quality standards, such as providing a lifetime warranty. (Def. Ex. 131 in Supp. Summ. J., Kipker Aff. ¶ 8,13; Def. Ex. 131.1 in Supp Summ J. § 1.7, 1.9.)  Safelite's network included 200 Safelite shops, 400 Safelite mobile units, and 10,500 network affiliate shops.  (Def. Ex. 131 in Supp. Summ. J., Kipker Aff. ¶ 5.)  The glass shops paid no charge to join the network and Safelite did not guarantee that it would refer any volume of claims from its call center.  (Def. Ex. 131 in Supp. Summ. J., Kipker Aff. ¶ 7,9.) Diamond entered into a Network Affiliate Participation Agreement ("Network Agreement") and was a member of the network from April 1, 2000 until it voluntarily terminated the relationship on April 1, 2002.

Policyholders needing glass repair would dial a toll-free number provided by their insurance companies, which connected them to one of Safelite's call centers.  The scripts developed pursuant to the service agreements guided the ensuing conversation with the

customer service representatives (CSRs).  The initial greeting was tailored for each insurance company.  If, for example, the policyholder was insured with ABC Insurance Co., the greeting would be, "Thank you for calling the ABC Insurance Glass program.  This is [name].  How may I help you?"  (See Safelite Ex.132.1 in Supp. Summ. J.; Hellwich Decl., 10/7/2005, Ex. 2, Tr. Phone Call 6/5/03; Hellwich Decl. 10/7/05, Ex. 3, Tr. Phone Call 4/24/03.)  Another possible greeting was, "Thank you for calling the ABC Insurance Glass program with services provided by Safelite."  (Def. Ex. In Supp. Summ. J. 132.1.)  The CSR would then request basic information about the insured and the damage to the vehicle.  (See Safelite Ex. in Supp. Summ. J. 132.1; Hellwich Decl., 10/7/2005, Ex. 2, Tr. Phone Call 6/5/03; Hellwich Decl. 10/7/05, Ex. 3, Tr. Phone Call 4/24/03.)   If the policyholder expressed a preference for a glass company that was not part of the Safelite network, the CSR would warn him that the price may exceed his coverage, the insurer could not guarantee the work, and the service may not equal that of the network shops.  (Hellwich Decl., 10/5/05, Ex. 13, Sample Script ¶ 24; Pl. Ex. 127 in Opp. Summ. J., Sample Script ¶ 21.)  One script, for example, provides, "You have the right to have the work performed at any glass shop you choose, but they may charge you more than what [ABC Insurance] is willing to pay and may not provide the total service offerings of the [ABC Insurance] glass program."[1]  (Pl. Ex. 127 in Opp. Summ J., Sample Script ¶ 21.)

After Diamond terminated its participation in the network in April 2002, it sent a

---

[1] These warnings are part of the "features and benefits" scripting.  We will refer to them simply as "the warnings."

4

series of letters to insurance companies complaining about Safelite's claims administration

practices.  From April 20 to April 26, 2002, Diamond sent letters to at least fifteen different

insurance companies.  (Def. Ex. 7-21 in Opp. Pl. Mot. Summ. J. ("Def. Opp. Ex.").)  These

letters accused Safelite of making false statements about Diamond's products and services

and using the claims administration program to direct customers to Safelite's glass shops.

(See, e.g., Def. Opp. Ex. 7.)  On June 6, 2002, Diamond sent another round of letters

accusing Safelite of stealing jobs.  (Def. Opp. Ex. 28-42.)

In addition, from 2002 to 2005, in an effort to increase business, Diamond provided

financial rewards, such as gift certificates or free gasoline cards, to insurance agents when

they referred policyholders.  (Def. Opp. Ex. 115, Joob Dep. 25; Def. Opp. Ex. 116, Chakales

Dep. 35.)  Diamond spent more than $ 4.5 million on gift cards to insurance agents from

2002 to 2005.  (Def. Opp. Ex. 114, Harris Dep. Ex. 4(g).)

## II.   Procedural History

On March 29, 2002, Diamond filed a complaint initiating the instant case.  Diamond

filed its First Amended Complaint on May 7, 2002.  Following a partial motion for summary

judgment, Diamond filed its Second Amended Complaint on February 18, 2004, which is

presently before this Court.  Therein, Diamond advances five counts stemming from

Safelite's claims administration.  In Count I, Diamond alleges that Safelite breached the

Network Agreement.  In Count II, Diamond maintains that Safelite violated various state

consumer protection statutes by using the claims administration business to improperly

influence policyholders.  In Count III, Diamond claims that Safelite tortiously interfered with its business relationships with policyholders. Count IV is a common-law disparagement claim.  Finally, Count V alleges that the CSRs' representations to callers constituted false advertising under the Lanham Act, 15 U.S.C. §  1125(a)(1).

On March 8, 2004 , Safelite filed seven counterclaims stemming from Diamond's letters to insurance companies and its gift card program.  Following a motion to dismiss, Safelite filed seven amended counterclaims on November 29, 2004.[2]

## III.    Jurisdiction

The Court exercises jurisdiction over this dispute pursuant to its federal question jurisdiction, 28 U.S.C. § 1331, and supplemental jurisdiction, 28 U.S.C. § 1367.  State law applies to those claims considered pursuant to supplemental jurisdiction.  United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966) (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938)).

## IV.    Standard

Granting summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  See Knabe v. Boury, 114 F.3d 407, 410 n.4 (3d Cir. 1997) (citing FED. R. CIV. P. 56(c)). "[T]his standard provides that the mere existence of some alleged factual dispute

---

[2] See infra Part VI for a discussion of the counterclaims.

between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986) (emphasis in original).

In considering a motion for summary judgment, the court must examine the facts in the light most favorable to the party opposing the motion. <u>Int'l Raw Materials, Ltd. v. Stauffer Chem. Co.</u>, 898 F.2d 946, 949 (3d Cir. 1990). The burden is on the moving party to demonstrate that the evidence is such that a reasonable jury could not return a verdict for the non-moving party. <u>Anderson</u>, 477 U.S. at 248. A fact is material when it might affect the outcome of the suit under the governing law. <u>Id.</u> Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. <u>Celotex v. Catrett</u>, 477 U.S. 317, 322 (1986). Once the moving party satisfies its burden, the burden shifts to the non-moving party, who must go beyond its pleadings, and designate specific facts by the use of affidavits, depositions, admissions, or answers to interrogatories showing that there is a genuine issue for trial. <u>Id.</u> at 324.

## V.    Safelite's Motion

Safelite has moved for summary judgment on each of Diamond's claims. Its central argument is that the Lanham Act,[3] disparagement, and tortious interference claims should be

---

[3] Safelite argues, and Diamond does not dispute, that the various state deceptive trade practices claims in Count II follow the same standards as the Lanham Act. Therefore, we will not

dismissed because the scripts and CSRs provided truthful, non-misleading guidance to policyholders.  It further argues that it did not violate the Network Agreement, and therefore, the breach of contract claim fails as well.  We will address each argument separately beginning with the Lanham Act.

### A.     Lanham Act

Count V of Diamond's complaint alleges that Safelite violated section 43 of the Lanham Act, 15 U.S.C. § 1125(a)(1), which proscribes false advertising.  In relevant part, it states:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact which (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1).

"Congress enacted section 43(a) of the Lanham Act 'to stop the kind of unfair competition that consists of lying about goods or services.'" Castrol v. Pennzoil, 987 F.2d 939, 941 (3d Cir. 1993) (quoting U-Haul v. Jartran, 681 F.2d 1159, 1162 (9th Cir. 1982)).  A plaintiff may establish a violation of this section by demonstrating either that: 1) the advertising was

---

discuss these statutes seperately.

literally false; or 2) the advertising was literally true or ambiguous but "given the

merchandising context, it nevertheless is likely to mislead and confuse consumers." Id. at

943 (quoting Johnson & Johnson v. GAC, 862 F.2d 975, 977 (2d Cir. 1988)). Thus, a

plaintiff must prove "either literal falsity or consumer confusion, but not both." Id. (citations

omitted).

Diamond argues that Safelite CSRs: 1) falsely conveyed in their greetings that they

were representatives of the insurance companies; and 2) falsely warned policyholders that

they could not guarantee Diamond's pricing or service after it left the network.[4]  Safelite

contends that the greetings and warnings were literally true and Diamond has produced

insufficient evidence to create a genuine issue of material fact as to consumer deception.

---

[4] Diamond also alleges that between April 1, 2000 and April 1, 2002, the CSRs falsely stated
that it was not a member of the network. These statements were not provided by the scripts, and
Diamond has produced evidence that they occurred on fewer than twenty occasions.  Section 43(a) of
the Lanham Act proscribes false or misleading statements in "commercial advertising or promotion."
15 U.S.C. § 1125(a).  Courts have adopted the following four part test to determine whether a
representation constitutes commercial advertising.  The contested representation must be: "'(1)
commercial speech; (2) by a defendant who is in commercial competition with the plaintiff; (3) for
the purpose of influencing customers to buy defendants' goods or services'; and, (4) although
representations less formal than those made as a part of a classic advertising campaign may suffice,
they must be disseminated sufficiently to the relevant purchasing public."  Fashion Boutique of Short
Hills, Inc., v. Fendi USA, Inc., 314 F.3d 48, 56 (2d Cir. 2002).  "[B]usinesses harmed by isolated
disparaging statements do not have redress under the Lanham Act; they must seek redress under
state-law causes of action."  Id. at 57 (finding that twenty-seven oral statements in a marketplace
with thousands of customers were not sufficiently disseminated to qualify as commercial advertising
or promotion).  Here, Diamond argues that on fewer than twenty occasions between April 2000 and
April 2002, Safelite CSRs informed policyholders that Diamond was not a member of the network.
During this same period, Safelite handled millions of phone calls and referred 93,349 claims to
Diamond.  (Def. Ex. 89 in Supp. Summ J., Taghvai Aff. ¶ 12.)  Given the total volume of calls and
the total number of referrals to Diamond, the few allegedly improper statements were not sufficiently
disseminated to constitute advertising.

1.      **Literal Falsity**

The test for literal falsity is simple:  "[i]f a defendant's claim is untrue, it must be deemed literally false."  Castrol, 987 F.2d at 944.  Even if the advertiser has a reasonable basis to support the truth of the advertisement, it will be liable if the statement is untrue.  Id. "In analyzing whether an advertisement or product name is literally false, a court must determine, first, the unambiguous claims made by the advertisement or product name, and second, whether those claims are false."  Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co., 290 F.3d 578, 586 (3d Cir. 2002) (citing Clorox Co. v. Proctor & Gamble Commercial Co., 228 F.3d 24, 34 (1st Cir. 2000)).

We find that Safelite's greetings and warnings were not literally false.  When greeting callers, the CSRs would state, "Thank you for calling the ABC Insurance Glass program. This is [name].  How may I help you?"  (See Safelite Ex. 132.1 in Supp. Summ. J.; Hellwich Decl. Oct. 7, 2005, Ex. 2, Tr. Phone Call June 5, 2003; Hellwich Decl. Oct. 7, 2005, Ex. 3, Tr. Phone Call April 24, 2003.)  Diamond claims that this greeting was false and Safelite was "masquerading" as an insurance company because the callers had reached Safelite's call centers, not the insurance company.  Diamond, however, ignores Safelite's agreements with the insurance companies that both affiliated the CSRs with the insurance companies for the purpose of providing their claims administration services and authorized the CSRs to represent themselves as the companies' representatives.  Safelite, in fact, was the "glass program" for the insurance companies and did provide their claims administration.  Moreover, the insurance companies approved the scripts that included the greeting, and thus

10

authorized the CSRs to make this greeting.  See MJ & Partners Rest. Ltd. P'ship v. Zadikoff, 10 F. Supp. 2d 922, 927-28 (N.D. Ill. 1990) (citing Ballet Makers, Inc. v. United States Shoe Corp., 633 F. Supp. 1328, 1335 (S.D.N.Y. 1986)) (finding that no consumer confusion as to source can exist when the disputed representation of source has been authorized by the owner of the mark); Official Airline Guides, Inc. v. Churchfield Publ'n, 756 F. Supp. 1393, 1405 (D. Or. 1990) (concluding no confusion as to affiliation existed where legitimate business relationship supported affiliation); Diebold v. Positran Mfg., No.CIV.A. 02-374, 2002 WL 31129726, at *4 (D. Del. Sept. 26, 2002) (citing Monte Carlo Shirt, Inc. v. Daewoo Int'l Corp., 707 F.2d 1054, 1057 (9th Cir. 1983)) (finding no consumer confusion where the defendant was authorized to produce the plaintiff's product).

We also find that the CSRs' warnings about Diamond's pricing and services after it left the network were not literally false.  They informed callers that the insurance companies could not guarantee the work of the non-network shops, these shops may charge more than is authorized by their coverage, and they may not provide the same services.  One script provided, for example, "You have the right to have the work performed at any glass shop you choose, but they may charge you more than what [ABC Insurance] is willing to pay and may not provide the total service offerings of the [ABC Insurance] glass program."  (Pl. Ex. 127.1 in Opp. Summ. J., Sample Script ¶ 21, SAFE00E005770.)  Another script provides, "[W]hile you may choose any shop you wish, do you understand that the benefits and warranties I just explained may not be provided by the shop you selected? Because this shop does not participate in the Blue Ribbon Glass Service, [ABC Insurance] cannot stand behind the

warranty your chosen shop may provide."  (Def Ex. 132.3 in Supp. Summ. J. ¶ 24.)

Diamond contends that Safelite's warnings were literally false because it never charged more than the insurance companies could pay, it informed Safelite and the insurance companies that it agreed to their pricing, and it provided its own warranty in its invoices to all customers.  The scripts, however, did not represent that Diamond's pricing *would* exceed the coverage, or that the workmanship *would* be of lower quality, or *Diamond* would not provide a warranty.[5]  Rather, it represented that the pricing *may* be higher, the services *may* not be the same,[6] and the *insurance company* could not guarantee the work.  After Diamond terminated its Network Agreement, it had no contractual arrangement with Safelite or the insurance companies and it was free to change its pricing, services, or warranty at any time without notice.  Diamond even took steps to preserve its right to charge prices exceeding the coverage by requiring customers to sign invoices that stated, "If the cost of all or part of this job is not covered by my insurance, I agree to pay Diamond Auto Glass the balance upon installation."[7]  (Def. Ex. in Supp. Summ. J. 57.)  On one occasion, Diamond informed an

---

[5] To the extent that individual CSRs strayed from the scripts and stated that Diamond's services would be inferior or the pricing would exceed coverage, Diamond has not created a genuine issue of material fact that this happened with sufficient regularity for these statements to qualify as advertising.  See supra note 4.

[6] "May: 1 a *archaic*: have the ability to b.: have permission to . . .: be free to."  MERRIAM-WEBSTER, COLLEGIATE DICTIONARY 718-19 (10th ed. 1999).

[7] While Diamond admits that it included this statement in the invoice, it claims it only enforced it to collect the deductible.  This is beside the point.  The issue is that Diamond required policyholders to sign a statement allowing it to recover the cost of the installation exceeding coverage, and it was free to enforce this in any way it chose.  Thus, the statement that Diamond *may* charge more than was covered was not literally false.

insurer that "We do expect payment in full for these claims.  If these claims are not paid in full, your insured will be responsible for the remaining payments."  (Def. Ex. in Supp. Summ. J. 144.)  Since Diamond was at liberty to change its prices, services, and warranty at any time after it terminated the Network Agreement, the CSRs' warnings that the insurance companies would not warranty the work and that Diamond may have had higher prices and different service were not literally false.

## 2.    Actual Confusion

If a claimant cannot demonstrate that the defendant made literally false statements, it can establish a false advertising claim if it can "prove actual deception by a preponderance of the evidence."  Highmark, Inc. v. UPMC Health Plan, Inc., 276 F.3d 160, 171 (3d Cir. 2001).  The claimant must establish, "actual deception or at lest a tendency to deceive a substantial portion of the intended audience."  Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co., 290 F.3d 578, 594 (3d Cir. 2002) (quoting Johnson & Johnson-Merck Consumer Pharm. Co. v. Rhone-Poulenc Rorer Pharm., Inc., 19 F.3d 125, 129 (3d Cir. 1994)).  A plaintiff "cannot obtain relief by arguing how consumers could react; it must show how consumers actually do react."  Castrol v. Pennzoil, 987 F.2d 939, 943 (3d Cir. 1993) (quoting Sandoz Pharm. Corp. v. Richardson-Vicks, Inc., 902 F.2d 222, 226 (3d Cir. 1990)).  "[T]he success of the claim usually turns on the persuasiveness of a consumer survey."  Rhone-Poulenc, 19 F.3d at 129-30.  In Rhone-Poulenc, the plaintiff alleged that the defendant's claim that Extra Strength Maalox Plus (ESMP) "is the strongest antacid there is" misled consumers to believe that ESMP provided superior relief to the plaintiff's product.

Id. 132.  The plaintiff offered five consumer surveys wherein researchers traveled to

shopping malls, aired the commercials to shoppers, and asked a number of questions.  Id.

The court found the surveys were not probative of actual consumer confusion because of the

leading and suggestive nature of the questions.  Id. at 135-36.  It then noted that the

plaintiff's expert opined that consumers were misled.  Id.  The court rejected this opinion,

stating:

> Even if we were inclined to agree with his personal opinion, Dr. Lieberman's
> personal opinion is not the legal standard by which the courts must determine
> whether consumers were misled. . . . If [the defendant's] commercials do
> mislead consumers into thinking that ESMP promises superior relief, well-
> designed consumer surveys will show that they do.  Absent such evidence,
> neither the district court nor this court can conclude that consumers were
> misled.

Id. at 136.

We find that Diamond's evidence, which consists of Dr. Barbara Kahn's expert report,

the depositions of various policyholders, and various phone call recordings, does not create a

genuine issue of material fact of "actual deception or at least a tendency to deceive a

substantial portion of the intended audience."  Novartis, 290 F.3d at 594 (quoting Rhone-

Poulenc, 19 F.3d at 129).  Dr. Kahn's report outlines her research into general consumer

behavior and her beliefs as to how consumers likely reacted to the CSRs' greetings and

warnings.  (Saf. Ex. 2 in Supp. Mot. Exclude Kahn Opinion, "Kahn Rep." 6-7.)[8]  She

---

[8] Safelite has moved to exclude Dr. Kahn's report for summary judgment purposes because it
fails the reliability and fit tests for expert testimony.  We need not reach the issue of admissibility
because even considering this report, we conclude that Diamond has not created a genuine issue of
material fact that the CSRs' greetings and warnings caused "actual deception or at lest a tendency to
deceive a substantial portion of the intended audience."  Novartis, 290 F.3d at 594 (quoting Rhone-
Poulenc, 19 F.3d at 129).  For this same reason, we need not address the admissibility of a counter-

conducted no survey into how consumers actually responded to the representations but reviewed a number of consumer depositions as well as recorded conversations with CSRs. (Kahn Rep. 4.)  Based on her experience and this evidence, she opined that the greeting led callers to believe that the CSRs were representatives of their insurance companies.  She also believed that the warning regarding non-network pricing and services created "uncertainty," which caused many callers to choose Safelite because its prices and services were guaranteed.  (Kahn Rep. 23-24.)

Kahn's opinion regarding the warnings does not take into account the relationships between Safelite and the insurers.  Kahn believes that the greetings gave policyholders the mistaken impression that the CSRs represented the insurance company.  "I believe that many consumers have the mistaken impression that the Safelite customer service representative (CSR) does not work for Safelite, but instead is a representative of their insurance company." (Kahn Rep. 6.)  The consumer depositions reveal that the greetings led many callers to believe that the CSRs were insurance representatives, or "from" the insurance companies. (See, e.g., Pl. Ex. 109 in Opp. Summ J., Pzenney Dep. 30.)  This impression, however, was not mistaken because, pursuant to Safelite's service agreements, the CSRs represented the

---

report authored by Dr. Eugene Erickson.  He conducted a consumer survey that concludes that the large majority of customers have no a priori preference for a specific glass company.  Although possibly relevant at trial, we find this evidence unnecessary for the disposition of the summary judgment motions.  Thus, we will deny as moot Diamond's motion to preclude consideration of his opinion for summary judgment purposes.

insurance companies for the purpose of administering their glass claims.[9]  Kahn did not take

into account Safelite's services agreements, and in fact, she did not review the service

agreements.  (Kahn Rep. 4.)  Therefore, the callers' impression that the CSRs represented the

insurance companies is not evidence of consumer deception.[10]

---

[9] To the extent that the consumers believed that the CSRs were actual insurance company employees rather than authorized third party administrators, Diamond has produced no evidence that this distinction was in any way material.  "While it has been stated that a failure to disclose facts is not actionable under § 43(a), it is equally true that a statement is actionable under § 43(a) if it is affirmatively misleading, partially incorrect, or untrue as a result of failure to disclose a material fact."  U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia, 898 F.2d 914, 921 (3d Cir. 1990) (quoting 2 J. McCarthy, Trademarks and Unfair Competition § 27:7B (2d ed. 1984)).  To establish a Lanham Act violation, the plaintiff must demonstrate "that the deception is material in that it is likely to influence purchasing decisions."  Novartis, 290 F.3d at 589 (quoting Rhone-Poulenc., 19 F.3d at 127).  Kahn opined that consumers would have reacted differently had the CSRs disclosed their affiliation with Safelite.  Kahn did not address whether consumers would have reacted differently had the CSRs disclosed that they were employees of Safelite, which the insurance companies hired to perform claims administration, authorized to perform service for any policyholder without a preference for a different company, and contracted with to ensure that the pricing and warranty would be covered.  There is no evidence that consumers would have reacted differently had the CSRs fully disclosed to each caller their affiliation with Safelite and the extent of Safelite's contractual arrangements with the insurance companies. Indeed, it appears highly unlikely that they would have reacted differently at all and it is possible that this full disclosure would have been even more effective in persuading policyholders to use Safelite instead of Diamond.

[10] Safelite also argues that Diamond's Lanham Act claims should be barred under the unclean hands doctrine because Diamond used similar greetings and warnings.  "The equitable doctrine of unclean hands applies when one party has committed an unconscionable act immediately related to the equity the party seeks in respect to the litigation . . . . The nexus 'between the misconduct and the claim must be close.'"  Highmark Inc. v. UPMC Health Plan, Inc., 276 F.3d 160, 174 (3d Cir. 2001) (citations omitted).  Safelite alleges that Diamond used the exact same scripting process, and therefore, its claims based on the warnings and greetings must fail.  Although we find a genuine issue of material fact as to whether Diamond employed similar warnings, there is no issue of fact that it used the same greetings in the same manner for which it seeks relief.  During non-business hours, Diamond handled first notice of loss calls for an insurance company (Pl. Ex. 11(c) in Opp. Summ. J., Richter Dep.  60-61) and greeted the callers by informing them that they had reached the insurance company's glass program rather than disclosing that they had reached Diamond acting as a third party administrator for the insurance company (Def. Ex. 102 in Supp. Summ. J. ¶ 10).  Diamond handled calls for another insurer client (Pl. Ex. 20(a) in Opp. Summ. J., Cogswell Dep. 42) and also greeted its policyholders by informing them that they had reached the insurer, rather than Diamond, (Def. Ex. 102 in Supp. Summ. J. ¶ 6,7).  Therefore, even if Diamond could successfully establish

As to the warnings, Kahn concludes they created "uncertainty" about non-network shops.  She observed that callers were assured as to Safelite's services and coverage "but there was doubt as to whether any other shop would be covered and guaranteed by the insurance company."  (Kahn Rep. 23.)  By guaranteeing Safelite's pricing and services while leaving Diamond's in doubt, Safelite ensured that most customers would choose Safelite.  (Kahn Rep. 24.)  Kahn concludes:  "Based on my review of the evidence, my education and experience, it is my opinion that the features and benefits scripting that the CSR uses is not used to educate the consumer, but rather is a tool to try to persuade the consumer to make a decision in favor of Safelite."  (Kahn Rep. 26.)  The Lanham Act, however, does not require that advertisements educate the consumer, and certainly does not prohibit the use of advertisements as a means for persuasion.  That the CSRs attempted to persuade callers to use Safelite by assuring Safelite's pricing and services while leaving the customers in doubt as to the pricing and services of its competitors is insufficient to establish a Lanham Act claim.  Doubt and confusion is not necessarily the result of misleading statements, and here is simply the result of the CSRs' failure to fully disclose all information about Diamond.  If Diamond sought to ensure that consumers were fully informed about its pricing, services, and warranty, it was free to take out advertisements on television, newspapers, or billboards to explain its pricing and services.  The Lanham Act does not require that Diamond's competitors provide this information for it.  Instead, to establish a claim, Diamond must

---

that Safelite's greetings violated the Lanham Act, the unclean hands doctrine would require that we grant summary judgment.

demonstrate that the CSRs' representation deceived callers into receiving a false message about Diamond's products or services.

Diamond has produced only a single incident where a caller was left with the wrong impression from the warnings.  This caller interpreted the warning that Diamond's prices may be higher to mean they would be higher.  She stated, "if (she) were to use another windshield repair company there would be overage that I would need to pay."  (Kahn Rep. 23.)  The other callers were merely given the impression that higher pricing was a possibility and were not provided with further detail.  (Kahn Rep. 23.)  This single incident of consumer confusion is not sufficient to establish a Lanham Act claim.  Some level of confusion is to be expected.  First Health Group Corp. v. BCE Emergis Corp., 269 F.3d 800, 805 (7th Cir. 2001) ("Some confusion and misunderstanding are inevitable in any business relation.  The Lanham Act deals only with confusion that exceeds the norm in the human condition.").  "Section 43(a)(1) forbids misleading as well as false claims, but interpreting 'misleading' to include factual propositions that are susceptible to misunderstanding would make consumers worse off by suppressing truthful statements that would help many of them find superior products. . . . 'Misleading' is not a synonym for 'misunderstood.'"  Mead Johnson & Co. v. Abbott Labs., 209 F.3d 1032, 1034 (7th Cir. 2000).  Thus, Kahn's opinion and the consumer depositions regarding the warnings are not probative of actual confusion because only a single customer was left with a false impression after speaking with the CSRs, and the remainder of the callers were merely assured of Safelite's pricing and services while left in doubt as to Diamond's.

18

An expert opinion is not the standard by which we measure actual consumer confusion.  Rhone-Poulenc, 19 F.3d at 136.  Kahn's report falls short for this reason.  "As an expert in consumer behavior, I was asked to evaluate the likely effect on consumer choice of the statements made by Safelite."  (Kahn Rep. 2) (emphasis added).  Diamond, however, must demonstrate how customers actually do react, not how they could react.  Sandoz, 902 F.2d at 226.  Thus, we conclude that Dr. Kahn's opinion along with the consumer depositions and phone calls do not create a genuine issue of material fact of "actual consumer deception or a tendency to deceive a substantial portion of the population," and we will grant summary judgment on the Lanham Act claim.

**B.     Breach of Network Participation Agreement**

In Count I, Diamond asserts that Safelite breached the implied duty of good faith and fair dealing in the Network Agreement.  Safelite argues that no implied duty existed under Ohio law,[11] and even if there was such a duty, it did not breach it.

In Littlejohn v. Parish, the court held that "public policy dictates that every contract contain an implied duty for the parties to act in good faith and to deal fairly with each other." 839 N.E.2d 49, 54 (Ohio Ct. App. 2005).  There, the plaintiffs mortgaged their home to the defendants and the note required that there be no penalty for prepayment, but provided that "[a]ny prepayment shall be subject to approval of holder(s) hereof."  Id. at 50.  When the plaintiffs attempted to prepay the note, the defendants repeatedly refused to grant their

---

[11] Both parties agree, and the Network Agreement provides, that Ohio law controls the contract claim.

approval.  Id. at 50-51.  Drawing upon Colorado law, the court found that the contract

included an implied duty to act in good faith, explaining that this duty is "generally used to

effectuate the intentions of the parties or to honor their reasonable expectations."  Id. at 54

(quoting Amoco Oil Co. v Ervin, 908 P.2d 493, 498 (Colo. 1995)).

Diamond argues that under Littlejohn all contracts contain an implied duty to act in

good faith and it had a reasonable expectation that Safelite would: 1) refer policyholders if

they had a preference for Diamond; 2) represent that Diamond was a member of the network;

and 3) accurately represent Diamond's pricing and services.[12]  We find that the implied duty

of good faith and fair dealing does not permit Diamond to impose these duties into the

Network Agreement.  Although Littlejohn states that all contracts contain the implied duty, it

limited the application of the implied duty to situations where "one party has discretionary

authority to determine certain terms of the contract.'"  Id. at 54 (quoting Amoco, 908 P.2d at

498).  There, the parties specifically deferred the decision on approval for prepayment and

provided the defendant with the discretion over this issue.  Id.  Thus, the implied duty

applied.  Id.

Under Colorado law, which Littlejohn found persuasive and includes the implied duty

in every contract, the implied duty applies solely where the contract leaves terms to the future

discretion of one party.  "The covenant may be relied upon only when the manner of

---

[12] Diamond also argues that Safelite's warnings about non-network shops breached the
Network Agreement.  Safelite, however, only made these representations after Diamond ceased to be
a member of the network.  Thus, these statements were made after the Network Agreement was
terminated.

performance under a specific contract term allows for discretion on the part of either party. . .
. However, it will not contradict terms or conditions for which a party has bargained."
Amoco, 908 P.2d at 498 (emphasis added); see also O'Reilly v. Physicians Mut. Ins. Co., 992
P.2d 644, 646 (Colo. Ct. App. 2000) ("the duty may be relied upon only when one party has
discretionary authority to perform certain contract terms, including discretionary acts, in good
faith.  Thus, a breach of the duty occurs when one party uses discretion conferred by the
contract to act dishonestly."); Wells Fargo Realty Advisors Funding, Inc., 872 P.2d 1359,
1363 (Colo. Ct. App. 1994) ("[T]he duty of good faith and fair dealing does not obligate a
party to accept a material change in the terms of the contract or to assume obligations that
vary or contradict the contract's express provisions.  Nor does the duty of good faith and fair
dealing inject substantive terms into the parties' contract.  Rather, it requires only that the
parties perform in good faith the obligations imposed by their agreement.").  "Discretion
occurs when the parties, at formation, defer a decision regarding performance terms of the
contract."  Amoco, 908 P.2d at 499.  Thus, we find that Littlejohn does not provide the
expansive duty that Diamond seeks.  Rather than generally requiring each party to fulfill the
unstated expectations of the other, Littlejohn provides that a plaintiff may rely on the implied
duty only if, at formation, the parties deferred a decision regarding performance of the
contract and placed it in the discretion of the defendant.

Furthermore, Ohio precedent belies Diamond's expansive interpretation of Littlejohn.
The good faith requirement "depends upon the language of the contract in each case."  B-
Right Trucking Co. v. Interstate Plaza Consulting, 798 N.E.2d 29, 37 (Ohio Ct. App. 2003)

(citing <u>Ed Schory & Sons, Inc. v. Soc'y Nat'l Bank</u>, 662 N.E.2d 1074, 1082-83 (Ohio 1996)).

"Longstanding Ohio law holds that there can be no implied covenants in a contract in

relation to any matter that is specifically covered by the written terms of the contract itself."

<u>Belfance v. Standard Oil</u>, No.14688, 1990 WL 203173, at *3 (Ohio Ct. App. Dec. 12, 1990).

In dismissing a claim for breach of the implied duty of good faith, the Ohio Supreme Court

stated:

> [Plaintiff] did not allege that [Defendant] breached the explicit terms of the
> written agreements. [Defendant's] decision to enforce the written
> agreements cannot be considered an act of bad faith. . . . "Firms that have
> negotiated contracts are entitled to enforce them to the letter, even to the
> great discomfort of their trading partners, without being mulcted for lack of
> 'good faith.' Although courts often refer to the obligation of good faith that
> exists in every contractual relation, this is not an invitation to the court to
> decide whether one party ought to have exercised privileges expressly
> reserved in the document. 'Good faith' is a compact reference to an implied
> undertaking not to take opportunistic advantage in a way that could not
> have been contemplated at the time of drafting, and which therefore was not
> resolved explicitly by the parties."

<u>Schory</u>, 662 N.E.2d at 1082-83 (quoting <u>Kahn & Nate's Shoes No. 2, Inc. v. First Bank of

Whiting</u>, 908 F.2d 1351, 1357-58 (7th Cir. 1990)).

Thus, under <u>Schory</u>, the implied duty applies where one party takes opportunistic

advantage of the other in a way that could not have been contemplated at the time of drafting,

<u>Id.</u>, and under <u>Littlejohn,</u> it applies where the contract leaves certain terms to the discretion of

one party, 839 N.E.2d at 54.  Neither of these situations is present here.  At the time of

drafting, Diamond could have contemplated that Safelite would use the network to direct

business to its own shops, and could have negotiated for explicit terms requiring Safelite to

honor customer preference, represent that Diamond was a member of the network, and

accurately explain Diamond's services and pricing.  Diamond, however, did not negotiate for

these terms.  Rather, the sole term addressing referrals explicitly provides that Safelite made

no commitment as to the volume of referrals Diamond would receive and Diamond would

not acquire the right to any customer.

> Participant understands and acknowledges that participation in the Safelite
> network is non-exclusive.  Safelite may contract with other participants in the
> same geographic area, and may provide customers with a choice of one or
> more participants in any geographic area.  Participant expressly acknowledges
> that neither Safelite nor any other person or entity acting on its behalf has
> made any commitments as to the volume or type of work that it may refer to
> Participant hereunder, and that Participant shall not acquire any proprietary
> right to any customers by virtue of participation in Safelite's network.

(Def. Ex. 131.1, Network Agreement § 8.1) (emphasis added).

Thus, the parties contemplated the possibility that Diamond may have desired a certain

amount of referrals or sought a right to referrals, but explicitly provided that Diamond did not

acquire this right.  The implied covenant of good faith and fair dealing does not allow

Diamond to retroactively re-write the contract to include the duties for which it neglected to

bargain.

> Plaintiffs want to turn the implied duty of good faith and fair dealing into . . .
> his own expectation or unexpressed intention about what the . . . Agreement
> meant or means.  Such use of an implied duty of good faith and fair dealing
> would obliterate the notion of a written contract as the expression of mutual
> understandings and allow either party to ask a jury to construct for them the
> contract they would have liked to have had.

Precision Seed Co. v. Consolidated Grain & Barge Co., No.Civ.A.03-79, 2006 WL 1281600,

at *2 (S.D. Ohio May 5, 2006).

Furthermore, the contract contains no provision deferring a decision on performance

or the terms of the contract, and thus <u>Littlejohn</u> is inapplicable.  Accordingly, we find that

Diamond may not rely on the implied duty of good faith and fair dealing in this situation and

we will grant summary judgment on its contract claim.

### C.    Disparagement

Safelite argues that Diamond's state disparagement claim fails because its scripted

warnings were truthful, and in the alternative, because the CSRs' statements were privileged.

To state a claim for disparagement, a plaintiff must establish that the defendant made

false statements.  <u>Menefee v. Columbia Broad. Sys., Inc.</u>, 329 A.2d 216, 220 (Pa. 1974)

(quoting RESTATEMENT OF TORTS § 633 cmt. f) ("In disparagement, the person . . .the quality

of whose goods has been attacked must prove that the disparaging statement of fact is

untrue."); <u>Toledo Heart Surgeons, Inc. v. Toledo Hosp.</u>, 798 N.E.2d 694, 696-97 (Ohio Ct.

App. 2003) (finding that disparagement is equivalent to defamation, which requires proof of

a false statement).  As discussed above in Part V.A.1, Safelite's scripted warnings about non-

network shops were true.  Therefore, to the extent Diamond rests its disparagement claim on

these statements, the claim fails.

Diamond, however, does not base its disparagement claim solely on the scripted

warnings, but bases it on other statements, such the CSRs' representations that Diamond was

not a network member between April 2000 and April 2002.[13]  It is uncontested that Diamond

_____

[13] As evidence that the CSRs made these representations, Diamond has produced the affidavits of its own representatives recounting conversations with insurance agents or policyholders who explained that the CSRs represented that Diamond was not a member during this period.  (<u>See, e.g.</u>, Pl. Ex. 128 in Opp. Summ. J., Decl. Rebekah Stanley ¶¶ 4).  Safelite argues that we should not consider the statements of the policyholders and insurance agents because they are hearsay.  In a

was a member of the network at that time, and therefore, these statements were false.

Safelite contends that even if untrue, the CSRs' statements are subject to a qualified privilege. In <u>Hahn v. Kotten</u>, the defendant insurance company informed some of its policyholders that it had terminated the plaintiff's employment for fraud and embezzlement. 331 N.E.2d 713, 715-16 (Ohio 1975). The plaintiff claimed that these statements were defamatory, but the defendant argued that they were privileged. <u>Id.</u> The court found that the insurer-insured relationship gave rise to a qualified privilege. <u>Id.</u> at 720.

> A qualified or conditionally privileged communication is one made in good faith on any subject matter in which the person communicating has an interest, or in reference to which he has a right or duty, if made to a person having a corresponding interest or duty on a privileged occasion and in a manner and under circumstances fairly warranted by the occasion and duty, right, or interest. The essential elements thereof are good faith, an interest

---

summary judgment motion, "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence" and must "show affirmatively that the affiant is competent to testify to the matters stated therein." FED. R. CIV. P. 56(e); see also Petruzzi's IGA Supermarkets, Inc., v. Darling-Delaware Co., 998 F.2d 1224, 1234 n.9 (3d Cir. 1993) (observing that evidence introduced at summary judgment stage must be "capable of being admissible at trial"). In J.F. Feeser, Inc. v. Serv-a-Portion, Inc., the district court refused to consider the affidavit of a business owner recounting the complaints of his sales representatives because the complaints were hearsay. 909 F.2d 1524, 1542 (3d Cir. 1990). On appeal, the court considered the complaints because "hearsay evidence produced in an affidavit opposing summary judgment may be considered if the out-of-court declarant could later present the evidence through direct testimony, *i.e.*, in a form that 'would be admissible at trial.'" Id. (quoting Williams v. Borough of West Chester, 891 F.2d 458, 465-66 n.12 (3d Cir. 1989)). The court reasoned that there was no indication that the salesforce would be unavailable to testify at trial, and their complaints, although hearsay statements in the affidavits, were capable of being reproduced through direct testimony. Id. Similarly, although the statements of the policyholders and insurance agents are hearsay in the affidavits of Diamond's representatives, there is no indication that the policyholders and insurance agents will be unavailable at trial. As to Safelite's assertion that their statements include multi-level hearsay because they recount what Safelite said to the policyholders, Safelite's statements are non-hearsay because they are admissions of a party-opponent. FED. R. EVID. 801(d)(2). Therefore, we will consider the policyholders' statements recounting Safelite's representations as evidence in opposition to the motion for summary judgment.

> to be upheld, a statement limited in its scope to this person, a proper
> occasion, and publication in a proper manner to proper parties only.

Id. at 718-19.

The court reasoned that the insurer-insured relationship presents a corresponding

interest sufficient to warrant the application of the privilege.

> Defamatory statements are conditionally privileged if they pertain to or are
> motivated by the existence of some special relationship such as the family,
> lawyer-client, doctor-patient, or insurer-insured relationship.  It is generally
> accepted . . . that one will take steps to protect the interests of another with
> whom he shares such a relationship

Id. at 720 (quoting 1 ARTHUR B. HANSON, LIBEL AND RELATED TORTS 99).

We find that this privilege applies in the present case.  Although the CSRs were not

employees of the insurer, they spoke on behalf on the insurer and had the duty to provide

information to the insureds regarding glass coverage and administration.  Both the insured

and Safelite shared an interest in the glass coverage and the network.  The CSRs' statements

were limited in scope to the communications regarding these topics, and were published

solely to insureds who called.  Therefore, we find that the CSRs statements are subject to a

qualified privilege.

Hahn noted, however, that a plaintiff can overcome this privilege if it can establish

that the defendant acted with actual malice and did not speak in good faith.  Id. at 721.

Defamatory statements are made with actual malice if the speaker is acting with "knowledge

that the statements are false or acting with reckless disregard to their truth or falsity." Jacobs

v. Frank, 573 N.E.2d 609, 614 (Ohio 1991).  Here, Safelite was aware that Diamond was a

member of its network but nevertheless falsely told some callers that it was not.  Therefore,

26

we find a genuine issue of material fact that the CSRs made statements knowing they were false or acting with reckless disregard to their falsity, and we will deny the motion for summary judgment on the disparagement claim.

###    D.    Tortious Interference with Business Relations

The following five elements establish tortious interference with business relations: "(1) a business relationship or contract; (2) the wrongdoer's knowledge of the relationship or contract; (3) the wrongdoer's intentional and improper action taken to prevent a contract formation, procure a contractual breach, or terminate a business relationship; (4) a lack of privilege; and (5) resulting damages." Brookeside Ambulance, Inc. v. Walker Ambulance Serv., 678 N.E.2d 248, 252 (Ohio Ct. App. 1996) (citations omitted). If the parties are in competition, the defendant's interference is subject to a qualified privilege. Id.

> One who intentionally causes a third person not to enter a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will does not interfere with the other's relation if
> (a)    the relation concerns a matter involved in the competition between the actor and the other and
> (b)    the actor does not employ wrongful means
> (c)    his action does not create or continue an unlawful restraint of trade and
> (d)    his purpose is at least in part to advance his interest in competing with the other.

Id. (quoting RESTATEMENT (SECOND) OF TORTS § 768 (1979)).

Diamond claims that it had prospective business relationships with policyholders who called the network, and Safelite interfered with these relationships. Diamond maintains that Safelite interfered in a number of ways, including through the greetings and warnings.

27

"[T]ruthful statements, where not confidential, would be a complete defense to tortious interference where the underlying claim is based on defamatory statements." El-Shiekh v. Northwest Ohio Cardiology Consultants, Nos.L-99-1380, 2000 WL 1298761, at *6 (Ohio Ct. App. 2000). Thus, the scripted greetings and warnings were not wrongful or improper means of influencing customers, and cannot serve the basis of this claim.

Diamond's tortious interference claim, however, is not based solely on the scripted statements and a reasonable jury could find some of Safelite's other activity constituted wrongful means to interfere with Diamond's prospective relationships with policyholders. For example, Diamond has produced evidence that Safelite serviced customers who had appointments with Diamond when those customers did not give Safelite consent to do so. In January 2004, James Martin called the network and reported that he planned to use Diamond, and the CSR informed him that Diamond was a recommended shop. (Pl. Ex. 144 in Opp. Summ. J., Martin Decl. ¶ 4.) Martin then scheduled an appointment with Diamond, but three hours prior to the appointment, a Safelite technician arrived and replaced the glass on his vehicle without his authorization. (Id. ¶ 7.)

To this end, Safelite argues that Diamond cannot establish the other elements of the tort, beginning with the requirement of a business relationship. Diamond contends that it had a prospective business relationship with the policyholders who expressed a preference for Diamond to the CSRs and with policyholders like Martin who had scheduled appointments with Diamond. Safelite maintains that Diamond had no expectation of a future relationship with these customers because Diamond's relationship was merely in the negotiation phase

28

and the policyholders were free to cancel their appointments at any time.  In <u>Reali,</u> <u>Giampetro & Scott v. Soc'y Nat'l Bank</u>, the plaintiff, an accounting firm, alleged that the defendant bank interfered with its prospective relationship with a former customer by requiring that the customer use a bank-approved accountant.  729 N.E.2d 1259, 1261-62 (Ohio Ct. App. 1999).  The court found that no prospective business relationship existed because the customer's prior agreements with the firm were not "ongoing in nature" and "all services had been completed under the agreements between the parties."  <u>Id.</u>

We agree that Diamond did not have a prospective business relationship with policyholders who called and merely expressed a preference for Diamond.  Tortious interference with business relations applies to "prospective contractual relationships, not yet reduced to a contract."  <u>Diamond Wine & Spirits v. Dayton Heidelberg Distrib. Co.</u>, 774 N.E.2d 775, 780-81 (Ohio Ct. App. 2002).  A previous business relationship does not ensure a future relationship.  <u>Reali</u>, 729 N.E.2d at 1261-62.  The prospective customer must have at least reached an understanding or agreement with the plaintiff to establish a prospective business relationship.  <u>Cooper v. Jones</u>, No.05CA7, 2006 WL 895210, at *5 (Ohio Ct. App. Mar 29, 2006).  Expressing a preference to a CSR does not establish that the customer entered into any agreement or understanding with Diamond, or even discussed potentially servicing his vehicle.  Therefore, we find that Diamond did not have a business relationship with policyholders who merely called Safelite and expressed a preference for Diamond.

We find that Diamond did have a prospective relationship with customers who, like Mr. Martin, scheduled appointments with it.  The appointment evinces an agreement to have

Diamond service the vehicle, even if that agreement was not yet reduced to a contract. Therefore, a reasonable jury could find that Diamond had a business relationship with  Mr. Martin and other customers with appointments.  Furthermore, Mr. Martin's situation creates a genuine issue of material fact regarding the other elements of the tort as well.  He made the appointment with Diamond through Safelite, so Safelite was aware of the prospective relationship.  Despite its knowledge of the appointment, it sent its own technician who serviced Martin's vehicle without his consent.  As a result, Diamond lost a sale and suffered damages.

Accordingly, we will grant the motion for summary judgment to the extent that Diamond bases its tortious interference claim upon Safelite's truthful warnings.  We will also grant the motion to the extent that Diamond claims Safelite interfered with its relationships with customers who merely called the network and expressed a preference for it.  However, we will deny the motion for summary judgment based the genuine issue of material fact that Safelite used tactics other than the scripts to interfere with Diamond's potential business relationship with policyholders who had already scheduled appointments with it.

**E.     Lost Profits**

Finally, Safelite argues that we should grant summary judgment on Diamond's lost profits claim because it relies solely on the expert opinion of Joseph Kenyon, which it claims fails the Daubert v. Merrill Dow Pharm., 509 U.S. 579 (1993) test for admissibility of expert opinions.

We need not reach the Daubert issue because, even ignoring Joseph Kenyon's report,

we find that Diamond has created a genuine issue of material fact that it suffered lost profits.

For example, as discussed above in conjunction with the tortious interference claim,

Diamond introduced evidence that it lost a sale to James Martin as a result of Safelite's

interference.  We recognize that Diamond did not lose the sale in the vast majority of the

incidents that it presents as evidence of the tortious interference or disparagement.  Diamond,

however, has presented evidence of some incidents, such as the one with Martin, where it lost

a sale.  Therefore, we find it has created a genuine issue of material fact that it lost profits.

The precise amount of damages is question of fact for the jury.  U.S. Healthcare, 989 F.2d at

922 (finding that individualized lost sales is probative of the quantum of damages, not the

fact of injury).  Therefore, we will deny summary judgment on Diamond's lost profits

claim.[14]

---

[14] In addition, the parties raise four procedural arguments, none of which has merit.  Diamond maintains that we should deny Safelite's summary judgment motion in its entirety because its statement of facts was not sufficiently brief or concise.  "A motion for summary judgment . . . shall be accompanied by a separate, short and concise statement of the material facts."  Local Rule 56.1. While we agree that Safelite's statement of facts was lengthy compared to that of a normal case, given the thousands of pages of exhibits in this case it was entirely appropriate, necessary, and helpful.  Therefore, we find that Safelite's statement of facts complied with Local Rule 56.1.

Safelite has advanced three procedural issues.  First, Safelite argues that the insurance companies should be joined as necessary parties under Federal Rule of Civil Procedure 19(a).  "A person who is subject to service of process and who will not deprive the court of jurisdiction over the subject matter shall be joined as a party in the action if . . . the person claims an interest relating to the subject of the action and is so situated that the disposition of the action may . . . leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest."  FED. R. CIV. P. 19(a).  Safelite argues that the disposition of this action might subject it to inconsistent obligations if we find for Diamond and enjoin their use of the scripts that are mandated by their contracts with the insurance companies.  We disagree because Safelite retains the right to refuse to use aspects of a proposed script and therefore may alter the scripts to satisfy any injunction.  (Pl. Ex. 52 in Opp. Summ. J., O'Mara Dep. 26-31.) Furthermore, as discussed above, we find that the greetings and warnings provided by the scripts are

## VI.    DIAMOND'S MOTION

Diamond seeks summary judgment on each of Safelite's Counterclaims.  In Counterclaim I, Safelite alleges that Diamond's letters to Safelite's insurance clients were defamatory.  Counterclaim II maintains that the letters constituted false advertising under the Lanham Act, 15 U.S.C. § 1125(a).  Counterclaim III alleges that Diamond's gift card program constitutes commercial bribery under section 3(c)of the Robinson-Patman Act, 15 U.S.C. § 13(c).  Counterclaim IV avers that Diamond intentionally interfered with Safelite's business relationships by providing the gift cards.  Counterclaim V is a common law unfair competition claim based on the gift cards.  Counterclaim VI alleges that the gift card program violated various state statutes proscribing deceptive trade practices and commercial bribery. Finally, Counterclaim VII avers that Diamond breached the Network Agreement by providing the gift cards because the agreement specifically required Diamond to comply with all laws and regulations applicable to its business.  Diamond argues that we should grant summary judgment on each of the Counterclaims, and we will address Diamond's arguments seperately.

### A.    Defamation

Diamond asserts that we should grant summary judgment on Safelite's defamation

---

not false or misleading and therefore, we will not enjoin their use.

In the final two procedural issues, Safelite argues that Diamond cannot maintain a 'steering' claim and has no standing to recover for calls that did not involve it in any way.  Diamond agrees on both points, noting that it does not advance a 'steering' claim and does not seek relief for calls that did not mention it.  Therefore, these issues are moot.

32

counterclaim because Safelite was a public figure and it cannot establish Diamond acted with

actual malice.  A statement is defamatory if it, "tends so to harm the reputation of another as

to lower him in the estimation of the community or to deter third persons from associating or

dealing with him."  U.S. Healthcare, 898 F.2d at 923 (quoting Birl v. Philadelphia Elec. Co.,

167 A.2d 472, 475 (Pa. 1960)) (quoting RESTATEMENT OF TORTS § 559 (1938)).  To recover

damages, a plaintiff must "demonstrate that the statement results from fault, amounting at

least to negligence, on the part of the defendant."  Id. (citations omitted).  The First

Amendment requires that the defendant act with actual malice if speaking about public

figures.  Steaks Unlimited, Inc. v. Deaner, 623 F.2d 264, 272 (3d Cir. 1980).  "In cases

dealing with plaintiffs who are 'public officials' or 'public figures,' states may not authorize

recovery unless the plaintiff proves, 'with convincing clarity,' that the defendants published

false material, knowing of its falsity or with reckless disregard for the truth."  Id. (quoting

New York Times Co. v. Sullivan, 376 U.S. 254, 279-80, 286-87 (1964)).  If the statements

concern a private figure, "the First Amendment forbids states to impose liability without

fault, but otherwise permits them 'to define for themselves the appropriate standard of

liability.'"  Id. (quoting Gertz v. Robert Welch, Inc., 418 U.S. 323, 347 (1974)).  An

individual is a general purpose public figure if he or she has "general fame or notoriety in the

community, and a pervasive involvement in the affairs of society."  Id. at 273 (quoting Getz,

418 U.S. at 352).  A defendant may be a limited purpose public figure if it thrust itself into

the public eye regarding the matters concerning the litigation.  Id.; see also James v. Gannett

33

Co. Inc., 353 N.E.2d 834, (N.Y. 1976) (finding James thrust into public eye by willingly

submitting to interview with newspaper and welcoming publicity).

 In Steaks, the plaintiff, an Ohio meat company, held a four day sale of beef at several

department stores in Pittsburgh, Pennsylvania.  Id. at 267.  "To promote its sales, Steaks

engaged in a widespread advertising campaign that included radio and newspaper

advertisements, large signs erected at sales locations, and the distribution of handbills to

persons walking near the [department] store."  Id.  After viewing the advertising and visiting

the department store, the defendants, a reporter and a television station, broadcast a report

that the meat was of poor quality and the price was higher than advertised.  Id. at 268.  The

court decided that Steaks was a public figure for the limited purpose of the report because the

company's extensive advertising campaign intentionally placed it in the public eye and

demonstrated that it had continuing access to the media to refute the defendants' report.  Id.

at 273-74.

Diamond argues Safelite also thrust itself into the public eye by operating a call center

for insureds across the nation.  We disagree.  In U.S. Healthcare, the court revisited Steaks

and found that an advertising campaign by a large corporation does not qualify it as a limited

purpose public figure.  898 F.2d at 938-39.  There, the defendant's campaign for its health

care services contained negative references to the plaintiff's competing service.  Id. at 918-

19.  Despite both parties' extensive access to the media and advertising on health care, the

court found that the allegedly defamatory statements in the advertisements were not entitled

34

to heightened protection because they constituted commercial speech.  Id. at 939.  "Although

some of the advertisements touch on matters of public concern, their central thrust is

commercial.  Thus, the parties have acted primarily to generate revenue by influencing

customers, not to resolve 'the issues involved.'"  Id.  The court distinguished Steaks,

explaining that it "involved a consumer reporter's statement, not a competitive advertising

campaign" and concluded that the reporter's statement on a matter of public concern was

entitled to higher protection.  Id.  It further explained that an advertising campaign alone will

not qualify the advertiser as a public figure.  Id.  "[I]t will always be true that such advertisers

have voluntarily placed themselves in the public eye.  It will equally be true that such

advertisers have access to the media. . . . We believe a corporation must do more than

claimants have done here to become a limited purpose public figure."  Id.

Just as in U.S. Healthcare, Diamond and Safelite are competing companies and the

allegedly defamatory statements addressed the competitor's business.  Unlike the statements

in Steaks, Diamond's allegedly defamatory statements were not part of a news broadcast on a

matter of public concern.   Moreover, Diamond does not seek to impose public figure status

upon Safelite based on an extensive advertising campaign such as the one in Steaks.

Diamond argues Safelite was a public figure merely because it chose to operate a nationwide

call center.  The plaintiff in Steaks ran an campaign including television and newspaper

advertisements, handbills, and large signs.  Safelite did not reach out to the public in this

way.  Instead, it simply received calls from policyholders across the nation.  Finally,

Diamond seeks to impose public figure status on Safelite based solely on its own commercial activities and advertising, a notion squarely rejected in U.S. Healthcare.  See also Computer Aid, Inc. v. Hewlett-Packard Co., 56 F. Supp. 2d 526, 536 (E.D. Pa. 1999) (finding that Hewlett-Packard was not a public figure because it had not thrust itself into a public controversy).  Therefore, we find that Safelite was not a limited purpose public figure and we will deny Diamond's motion for summary judgment on Safelite's defamation claim.

### B.      Lanham Act

In Counterclaim II, Safelite alleges that Diamond's letters constituted false advertising in violation of the Lanham Act.  Diamond argues that it is entitled to summary judgment on this claim because the letters do not amount to false advertising.[15]

A representation is advertising under the Lanham Act if it is:

> "(1) commercial speech; (2) by a defendant who is in commercial competition with the plaintiff; (3) for the purpose of influencing customers to buy defendants' goods or services"; and, (4) although representations less formal than those made as a part of a classic advertising campaign may suffice, they must be disseminated sufficiently to the relevant purchasing public.

Fashion Boutique of Short Hills, Inc., v. Fendi USA, Inc., 314 F.3d 48, 56 (2d Cir. 2002).

Diamond argues that Safelite cannot establish the third element, that the letters were sent to influence customers to purchase Diamond's services.  Diamond notes that the letters do not reference any effort to sell claims administration services and its former Vice

---

[15] Diamond also claims it is entitled to summary judgment because Safelite presents no evidence that it suffered an injury stemming from the letters.  We will discuss this issue in Part VI.D.1, infra.

President, Kevin Gill, denied that the letters were sent for the purpose of influencing insurers in this manner.  (Def. Opp. Ex. 77, Gill Dep. at 174-75.)

We find Safelite has created a genuine issue of material fact as to whether Diamond sent the letters for the purpose of influencing the insurance companies to purchase its claims management service.  Diamond sought to establish a call center (Def. Opp. Ex. 80, 81) and Gill explained that Diamond desired to increase its market share of the claims management business.  (Def. Opp. Ex. 77, Gill Dep. at 52).  "We had a very small market share of a very big piece of pie.  We wanted a bigger piece of pie, like we did in every one of our businesses."  (Id.)  Diamond made formal sales presentations to insurance companies in an effort to expand its claims management business.  (Id. at 52-55).  Diamond made sales presentations to the same insurance companies within a few months of sending them the allegedly defamatory letters.  (Compare, e.g., Def. Opp Ex. 14, April 20, 2002 letter, with Def. Opp. Ex. 57, July 2, 2002 presentation to same company; compare, e.g., Def. Opp Ex. 91, April 20, 2002 letter, with Def. Opp. Ex. 60, August 9, 2002 presentation to same company.)

Thus, Diamond criticized its competitor during its campaign to increase its business, it sent the letters to some of the same companies it sought as clients, and the letters criticized the exact segment of Safelite's business that Diamond sought to increase.  We find a reasonable jury could find that disparaging comments to a potential client regarding a competitor's business were made for the purpose of influencing that customer to use its

37

goods or services.  See, e.g., Fuente Cigar v. Opus One, 985 F. Supp. 1448, 1455 (M.D. Fla.

1997).  Accordingly, we will deny Diamond's motion for summary judgment on the Lanham

Act claim.

### C.    Robinson-Patman Act

In Counterclaim III, Safelite claims Diamond engaged in commercial bribery in

violation of section 2(c) of the Robinson-Patman Act, 15 U.S.C. §13(c), by providing gift

cards to insurance agents when the agents referred customers to Diamond.

The purpose of section 2(c)[16] was to prevent large chain stores from receiving reduced

prices from their suppliers by requiring the suppliers to pay a "brokerage" to the chain stores'

employees, even though these employees provided no services to the suppliers.  Seaboard

Supply Co. v. Congoleum Corp., 770 F.2d 367, 371 (3d Cir. 1985).  The act applies solely

where the individual receiving the bribe is an employee or agent of the party to the

transaction other than the party paying the bribe.  Id. at 372.  To be considered agents, the

individuals receiving the bribes must have the authority to bind a party in the transaction, and

they will not be considered agents if they merely "enjoy a special relationship of trust."

Bridges v. MacLean Stevens Studios, Inc., 201 F.3d 6, 11-12 (1st Cir. 2000) (citing Steven

---

[16] This section reads: "It shall be unlawful for any person engaged in commerce, in the course of such commerce, to pay or grant, or to receive or accept, anything of value as to a commission, brokerage, or other compensation, or any allowance to discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods, wares, or merchandise, either to the other party to such transaction or to an agent, representative, or other intermediary therein where such intermediary is acting in fact for or in behalf, or is subject to the direct or indirect control, of any party to such transaction other than the person by whom such compensation is so granted or paid." 15 U.S.C. §13(c).

Jay Photography v. Olan Mills, Inc., 903 F.2d 988, 991 (4th Cir. 1990)) (finding that a school receiving commissions from a photography company was not an agent of the parents purchasing the photographs because the school had no authority to bind the parents' decisions to purchase pictures, even though the school certainly occupied a position of trust). Thus, the act does not apply if the bribe fails to cross the "buyer-seller" line.  Id.

In Seabord, the plaintiff was a wholesale distributor of felt.  770 F.2d at 369-70.  The defendant, a competing distributor, was also a sales agent for a felt manufacturer.  Id.  The defendant paid an employee of the manufacturer a commission for each sale to consumers. Id.  The plaintiff alleged that this arrangement violated the act, but the court disagreed because the bribe did not cross the buyer-seller line.  Id.  It reasoned that the buyer of the felt was not involved in the bribe.  Id.  Rather, a sales agent of the seller paid the bribe to an employee of the seller.  Id.

Diamond argues that the gift cards did not pass from the seller to the buyer because the recipients, the insurance agents, were not employees or agents of the policyholders. Safelite counters that the buyers in the transaction were the insurance companies, and thus the bribe did pass from the seller to the buyer.  We find Safelite's argument unpersuasive. The transaction in question is Diamond's repair/replacement of consumers' auto glass.  That these consumers are policyholders who have insurance coverage does not convert the insurance companies into the buyer.  The policyholders, not the insurance companies, received the glass, had their windshields fixed, and ultimately chose the glass company.

39

Thus, the seller was Diamond and the buyers were the policyholders.  As Diamond argues,

the insurance agents are agents of the insurance companies, not the policyholders. Although

they may occupy a position of trust with policyholders, they do not have the authority to bind

them to a specific glass company and the policyholders remained free to ignore their

suggestions and choose whatever glass company they prefer.  Bridges, 201 F.3d at 11-12

(discussing Steven Jay Photography, 903 F.2d at 991).  Therefore, we find bribes from

Diamond to the insurance agents did not cross the buyer-seller line, and we will grant

summary judgment on the Robinson-Patman Act claim.

### D.    Injury

Diamond argues that Safelite cannot identify any customer it lost because of the letters

or the gift card program.  We find that Safelite's counterclaims do not require such a

specified showing to establish an injury, and it has produced sufficient evidence to create a

genuine issue of material fact that it was injured by Diamond's actions.

### 1.    Insurer Letters

Safelite's claims based on the insurer letters, the Lanham Act and defamation claims,

do not require proof of individualized loss of sales.  For the Lanham Act claim, Safelite "is

not required at this stage to demonstrate particular instances of actual injury."  Accu-Sort

System, Inc. v. Lazerdata Corp., 920 F. Supp. 928, 931 (E.D. Pa. 1993).  "The requirement

that a plaintiff prove injury 'does not place upon the plaintiff a burden of proving detailed

individualization of loss of sales.  Such proof only goes to quantum of damages and not to

the very right to recover.'" Id. (quoting U.S. Healthcare, 898 F.2d at 922).  Furthermore, the

Lanham Act provides damages for injuries other than loss of sales.[17]  See Novartis Consumer

Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co., 290 F.3d 578, 586-87 (3d

Cir. 2002) (describing injury as "declining sales, loss of good will, etc"); Balance Dynamic

Corp v. Schmitt Industries, 204 F.3d 683, 693-94 (6th Cir. 2000) (finding the Lanham Act

allows "money damages to compensate for marketplace injury such as harm to goodwill");

---

[17] Diamond asserts that we should preclude Safelite from providing evidence of damages
other than those identified by its corporate designee pursuant to Federal Rule of Civil Procedure
30(b)(6) because he was unable to answer Diamond's questions regarding damages. (Diamond Br.
in Supp. Mot. Summ J. 10).  "Q. Does Safelite contends that it's sustained any damages as a result of
the violation of the Lanham Act?  A. I can't answer that one."  (Id.)  Diamond contends Rule
30(b)(6) binds the company to the answers given by the corporate designee, and since he could not
explain the damages, Safelite cannot produce any additional evidence on this issue.  Diamond
misconstrues the purpose and effect of Rule 30(b)(6).  Rule 30(b)(6) requires that a party served with
a notice of deposition under the rule must designate a corporate representative to "testify as to
matters known or reasonably available to the organization."  FED. R. CIV. P. 30(b)(6).  The corporate
designee does not merely speak for his own personal knowledge, but is "speaking for the
corporation."  Rainey v. Am. Forest & Paper Assoc., 26 F. Supp. 2d 82, 94 (D.D.C. 1998).  Thus,
when a corporation designates a representative, it cannot present "a theory of facts that differs from
that articulated by the designated representatives."  Id.  Safelite, however, has not presented an
alternate theory of the facts.  Its corporate designee was unable to fully answer questions about
damages, but he never testified that Safelite suffered no damages or only suffered a specific type of
damages.  Under these circumstances, preventing Safelite from producing other evidence of damages
would be a particularly draconian measure.  A court may preclude a party from presenting evidence
on an issue based on a discovery failure solely if the party fails to obey an order to provide discovery.
FED. R. CIV. P. 37(b)(2)-(b)(2)(B).  Diamond does not contend that it moved to compel the
production of this evidence, nor that the witness thereafter disobeyed an order to compel.  It argues
that this court should impose the sanction simply because the witness could not answer the questions,
even though it never filed a motion to compel and a motion for sanctions.  The Federal Rules of Civil
Procedure do not allow such a severe sanction under these circumstances.  If Diamond needed this
information, it was free to follow the procedures set forth for compelling its production.  Moreover,
precluding further evidence of damages would run counter to Safelite's duty to seasonably
supplement its 30(b)(6) discovery responses.  See FED. R. CIV. P. 26(e)(1).  Therefore, we will not
limit Safelite's evidence of damages to the testimony of its corporate designee.

Southland Sod Farms v. Stover Seed Co., 108 F.3d 1134, 1139 (9th Cir. 1997) (explaining that a Lanham Act defendant can show an injury either by direct diversion of sales or loss of good will); PPX Enter., Inc. v. Audiofidelity Enter., Inc., 818 F.2d 266, 272-73 (2d Cir. 1987) (upholding a damage award without proof of negative consumer reaction because the advertising was literally false).

For the defamation claim, if Diamond acted with actual malice, Safelite need not prove loss of sales but may recover solely for damage to reputation. Beverly Enter., Inc. v. Trump, 182 F.3d 183, 188 n.2 (3d Cir. 1999) (citing Frisk v. News Co., 523 A.2d 347, 354 (Pa. 1986)). We find a genuine issue of material fact that Diamond acted with actual malice. Actual malice is "knowledge that [a statement] was false . . .or a reckless disregard of whether it was false or not." Schiavone Constr. v. Time, Inc., 847 F.2d 1069, 1076 (3d Cir. 1988) (quoting New York Times Co. v. Sullivan, 376 U.S. 254, 280 (1964)).  The standard tests whether the defendant "had subjective awareness of probable falsity." Id. at 1089 (quoting Gertz v. Robert Welch, Inc., 418 U.S. 323, 355 n.6 (1974)).  "[C]ircumstantial evidence can override defendants' protestations of good faith and honest belief that the report was true." Id. at 1090 (citing St. Amant v. Thompson, 390 U.S. 727, 732 (1968)).  After Diamond sent its initial letters in April 2002, several of the insurance companies responded to Diamond to rebut the claims.  Even after receiving these letters, Diamond sent another round of letters including the same accusations.  Thus, we find a genuine issue of material fact that Diamond had a subjective awareness of the probable falsity of their claims.  Even if

42

Safelite cannot establish a loss of sales,[18] it may maintain its defamation claim if Diamond

acted with actual malice.

Accordingly, even if Safelite cannot establish that it lost a single customer as a result

of Diamond's letters, its Lanham Act and defamation claims survive summary judgment.

## 2.    Gift-cards

---

[18] Furthermore, we find a genuine issue of material fact as to whether Diamond's letters caused Safelite to lose customers.  Safelite alleges that two clients, Harleyville and Bear River, cancelled their claims administration service based on these letters.  Diamond contends that these companies cancelled the service because of the lawsuit, not because of the letters, and the allegations of the lawsuit are entitled to absolute immunity.  We, Inc. v. City of Philadelphia, 174 F.3d 322, 327 (3d Cir. 1999) (citations omitted) ("[L]iability cannot be imposed for damage caused by inducing . . . judicial action.").  Safelite representatives testified that Harleyville and Bear River both told Safelite that the lawsuit played a part in the cancellation of their contracts.  We find, however, that a reasonable jury could believe that Harleyville and Bear River cancelled their contracts based on the letters, not the lawsuit.  (Def. Opp. Ex. 76, 76.)  This lawsuit was filed on March 9, 2002, and the letters were sent after the filing of the lawsuit but before Harleyville and Bear River cancelled their contracts.  (See, e.g., Def. Opp Ex. 9, 4/2002, Diamond Letter to Bear River; Def. Opp. Ex. 32, 6/2002, Diamond Letter to Bear River.)  The letters, even though they contained allegations central to the complaint and included in the complaint, were extrajudicial because Diamond sent the letters outside the course of the judicial proceedings.  Bochetto v. Gibson, 860 A.2d 67, 72-72 (Pa. 2004) (finding that the defendant was not entitled to immunity for defamation where he republished a complaint outside the judicial context).

Diamond has also argued that Safelite's 30(b)(6) designee testified that Harleyville and Bear River claimed the lawsuit was the reason they cancelled the contract, and since Safelite's current position is contrary to this testimony, it must be precluded.  We disagree.  The corporate designees only testified that the lawsuit was a reason given, not that this in fact was the reason or the whole reason.  Moreover, it is unclear from the corporate designees' responses whether Harleyville and Bear River cancelled their contracts based on the actions taken in conjunction with the lawsuit or based on the extra-judicial re-publication of the allegations.  One Safelite representative stated, "There was some element of the litigation that caused them to make the decision they did."  (Def. Opp. Ex. 67, Feeney Dep. 57.)  Another explained, "Bear River Insurance and Harleyville . . .  both of those programs were cancelled subsequent to the litigation.  And the Diamond Triumph accusations and allegations in the lawsuit was [sic] the reasons they gave us."  (Def. Opp. Ex. 78, Feeney Dep. at 269-74.)  Thus, there was no clear distinction that the allegations within the legal proceedings were the reasons for the cancellation as opposed to the publications of the lawsuit's allegations in the letters outside of the judicial context.  Accordingly, we find a genuine issue of material fact as to why Bear River and Harleyville cancelled their contracts.

Diamond contends that Safelite's unfair competition claims[19] based on the gift card program must fail because Safelite cannot identify a single policyholder that would have used Safelite but for the gift card program.  We find that Safelite has created a genuine issue of material fact that it suffered an injury because of the program.

### a.    Intentional Interference With Business Relations

To establish a claim for intentional interference with business relations, a plaintiff must prove "the occasioning of actual legal damage as a result of the defendant's conduct." Strickland v. Univ. of Scranton, 700 A.2d 979, 985 (Pa. Super. Ct. 1997) (citations omitted).[20]  Actual legal damage is "pecuniary loss flowing from the alleged interference with contract" and does not include recovery solely for harm to business reputation.  Shiner v. Moriarty, 706 A.2d 1228, 1239 (Pa. Super. Ct. 1998) (citing Pelagatti v. Cohen, 536 A.2d 1337, 1343 (Pa. Super. Ct. 1987)).  The measurement of damages cannot be mere speculation or guesswork, but it also need not be a precise calculation and may be an estimate.  Judge Technical Serv., Inc. v. Clancy, 813 A.2d 879, 885 (Pa. Super. Ct. 2002).

> The general rule in this Commonwealth is that the plaintiff bears the burden
> of proof as to damages.  The determination of damages is a factual question
> to be decided by the fact-finder. The fact-finder must assess the testimony,
> by weighing the evidence and determining its credibility, and by accepting or

---

[19] These claims include Counts III-VII.  We need not address the Robinson-Patman Act claim because we will dismiss it on other grounds.

[20]  The same standard applies whether the tort is labeled intentional interference with business relations or contractual relations.  Compare id., with InfoSAGE, Inc. v. Mellon Ventures, L.P., 896 A.2d 616, 627 (Pa. Super. Ct. 2006) (applying same standard for interference with prospective business relations).

rejecting the estimates of the damages given by the witnesses. Although the fact-finder may not render a verdict based on sheer conjecture or guesswork, it may use a measure of speculation in estimating damages. The fact-finder may make a just and reasonable estimate of the damage based on relevant data, and in such circumstances may act on probable, inferential, as well as direct and positive proof.

Id.

In Judge, the plaintiffs, both personnel placement companies, sued a competing company for tortiously interfering with its employment contracts.  813 A.2d at 884.  The defendant had hired three of the plaintiffs' former employees even though these employees signed non-compete agreements with the plaintiffs.  Id. at 883-84.  After the trial court awarded over $500,000 in damages for tortious interference, the defendants argued that the award was based on "sheer conjecture."  Id. at 886.  The court disagreed and upheld the award even though the plaintiffs presented no evidence that any specific client abandoned their business for the defendant's following the tortious interference.  Id.  The court found the damage calculation supported by evidence that the three former employees generated millions of dollars in revenue when they were employed with the plaintiffs, and the plaintiffs' business suffered following their departure.  Id.   It reasoned:

The risk of uncertainty should be thrown upon the wrongdoer instead of upon the injured party.  The precise amount cannot be ascertained by a fixed rule, but must be a matter of opinion and probable estimate.  And the adoption of any arbitrary rule in such a case, which will relieve the wrongdoer from any part of the damages, and throw the loss upon the injured party, would be little less than legalized robbery.

Id. at 885 (quoting Com. Trust Co. of Pittsburgh v. Hachmeister Lind Co., 181 A. 787, 790 (Pa. 1935)).

45

Thus, Safelite need not identify specific lost customers, and we find it has created a genuine issue of material fact that it suffered an actual pecuniary loss as a result of Diamond's gift card program.[21]  Diamond used the gift cards to induce insurance agents to direct policyholders, who otherwise had no preference for Diamond, to use Diamond.  (Def. Opp. Ex. 107, 108.)  Customers with no preference were nevertheless directed to use Diamond by agents who received gift cards for their referrals.  The service agreements provided that Safelite would perform the work for policyholders without a preference, and thus, had Diamond not injected a preference through the use of the gift cards, these policyholders likely would have used Safelite.  In addition, Safelite has produced the expert report of Dr. Phillip Beutel explaining that Safelite's gift card program increased the number of referrals from Safelite's network to Diamond relative to the total number of referrals to both Diamond and Safelite.  (Def. Opp. Ex. 66, Dr. Beutel Rep. ¶ 31.)[22]  Thus, Diamond's

_____

[21]  Safelite has also noted that the lack of precision in its damage estimate is partially the result of missing documents regarding the gift card program.  Diamond contends that these documents were not destroyed or lost, but rather stolen by former employees.  Regardless of why Diamond no longer has these documents, it was not the result of any action by Safelite.  Diamond, not Safelite, should bear the risk of whatever imprecision results from the lost documents.  Judge, 813 A.2d at 885 (citing Com. Trust Co., 181 A. at 790).

[22]  Diamond has filed a motion to preclude consideration of Dr. Beutel's opinion for summary judgment purposes because he failed to provide a sufficient basis under Daubert v. Merrill Dow Pharm., 509 U.S. 579 (1993) for his conclusion that the gift card program injured Safelite.  We find that Dr. Beutel's report satisfies the Daubert test.  An expert witness may testify to "scientific, technical, or other specialized knowledge [that] will assist the trier of fact."  FED. R. EVID. 702.  The testimony will be admissible if the process or technique used in formulating the opinion is reliable.  In re Paoli R.R. Yard PCB Litigation, 35 F.3d 717, 742 (3d Cir. 1994) (citing Daubert, 509 U.S. 579 (1993)).  In addition, the testimony must 'fit' the issues before the court.  Id.  The fit test requires that the proponent of the opinion establish that "the proffered connection between the scientific research or test result to be presented and particular disputed factual issues in the case."  Id. at 743

gift card program increased the number of referrals to Diamond at Safelite's expense.  (Id.)

Therefore, we conclude Safelite has created a genuine issue of material fact that it suffered

an actual pecuniary loss flowing from Diamond's gift card program.[23]

---

(noting that Daubert explicitly adopted the 'fit' test set forth in United States v. Downing, 753 F.2d 1224 (3d Cir. 1985)).  Thus, qualification, reliability, and fit are the three prongs of the Daubert analysis.  Id. at 741-42.  Diamond argues that Dr. Beutel's conclusion that Safelite suffered an injury as a result of the gift card program is based on speculation and unsound methodology. We disagree. Dr. Beutel concluded that the gift card program harmed Safelite by comparing Diamond's gift card spending with its share of the portion of the total referrals that went to either it or Safelite.  (Def. Opp. Ex. 66, Dr. Beutel Rep. ¶ 31, Attch. 6.)  He reasoned that Diamond's gift-card spending did not increase the glass market on the whole, and thus, if Diamond increased its market share, it did so at the expense of its competitors. (Beutel Rep. 21 n.66.)  To support this theory, he compared Diamond's gift card spending with its share of it and Safelite's combined portion of the market, and found that as Diamond increased its spending, it increased its share and decreased Safelite's share. From this data, he concluded that Diamond's gift-card program increased its share at Safelite's expense.  Diamond argues that his analysis does not account for several other possible interpretations of the data.  It argues that Diamond may have increased its share of that portion of the market by taking customers from other glass companies, thus increasing its own share of its and Safelite's combined portion, but also increasing the combined portion.  Under this scenario, even if Safelite increased its own share of the combined portion, it would have done so without taking customers from Safelite.  We find, however, that notwithstanding this possibility, Dr. Beutel's analysis is based on sound statistical methodology and reliable principles, and thus his conclusion is admissible.  The proponents of expert opinions "do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are *correct,* they only have to demonstrate by a preponderance of evidence that their opinions are reliable."  In Re Paoli R.R., 35 F.3d at 744.  "The grounds for the expert's opinion merely have to be good, they do not have to be perfect. The judge might think that there are good grounds for an expert's conclusion even if the judge thinks that there are better grounds for some alternative conclusion, and even if the judge thinks that a scientist's methodology has some flaws such that if they had been corrected, the scientist would have reached a different result."  Id.  Dr. Beutel used a sound statistical analysis to compare Diamond's gift-card spending to its share of Diamond and Safelite's combined portion of the market.  He established that Diamond did in fact increase its share and decrease Safelite's share through the use of the gift cards. He concluded that this evidence reveals that Safelite suffered an injury.  Therefore, we find that Dr. Beutel's analysis satisfies the fit and reliability prongs of Daubert, and we will deny Diamond's motion to exclude his opinion for the purposes of its summary judgment motion.

[23] For these same reasons, we find that Safelite has produced created a genuine issue of material fact that it suffered damages under Counterclaim V, unfair competition, and Counterclaim VII, breach of contract.

### b.    Deceptive Practices

In Counterclaim VI, Safelite alleges that Diamond's gift card program violates the commercial bribery/unfair trade practices statutes of North Carolina, N.C. GEN. STAT. § 75-1.1, West Virginia, W. VA. CODE § 47-11A-3, and South Carolina, S.C. CODE. ANN. § 39-5-170(3).  In addition, Safelite alleges that the program violates Illinois common law.  Williams Electronics Games, Inc. v. Garrity, 366 F.3d 569, 576 (7th Cir. 2004).  Diamond again argues the Safelite cannot create a genuine issue of material fact that it suffered damages as a result of the violation of these statues.  We disagree.  Safelite has produced evidence that at least four policyholders in North Carolina and five in West Virginia, who had no preference for an auto glass company and thus under the service agreements would have used Safelite, used Diamond based on the direction of their insurance agents who received payments from Diamond.  Furthermore, as discussed above, Dr. Beutel's analysis creates a genuine issue of material fact that the gift card program harmed Safelite, and there is no question that Diamond conducted the program in North Carolina, West Virginia, South Carolina, and Illinois.[24]  Therefore, we will deny Diamond's motion for summary judgment.

---

[24] Safelite has argued in the alternative that the total amount of the bribes is an appropriate measure of the damages.  We disagree.  The amount of a bribe is an appropriate measure of damages where the cost of the bribe was presumably passed on to the plaintiff because the bribed individual was its fiduciary or agent.  Kewaunee v. Pegram, 503 S.E.2d 417, 418 (N.C. Ct. App. 1998);Williams Elec. Games, Inc. v. Garrity, 366 F.3d 569, 576 (7th Cir. 2004).  In Kewaunee, an employee of a furniture manufacturer received bribes from the defendants to purchase their glass doors for use in his employer's furniture.  503 S.E.2d at 418.  The defendants argued that the employer could establish no harm from this scheme.  Id. at 419.  The court found that the employer was harmed by the amount of the bribes received by its employee, reasoning, "[t]he amounts given to the unfaithful employee could and should have been paid [to] his employer."  Id. (quoting Phillips Chem. Co. v.

**VII.   Conclusion**

For the reasons expressed above, we will grant each motion for summary in part and deny each in part.  We will grant summary judgment on Diamond's Lanham Act claim, state law consumer deception claims, and breach of contract claim.  We will grant summary judgment on the disparagement claims to the extent that it relies on Safelite's warnings about Diamond's services and pricing when it was a non-network shop.  We will deny it in all other respects.  We will grant summary judgment on the tortious interference with business relations claim to the extent it is based on Safelite's warnings.  We will also grant the motion to the extent that Diamond claims Safelite interfered with its relationships with customers who merely called the network and expressed a preference for it.  We will deny the motion to because we find a genuine issue of material fact that Safelite used tactics other than the scripts to interfere with Diamond's potential business relationship with policyholders who had already scheduled appointments with it.  We also will deny summary judgment on the

---

Morgan, 440 So.2d 1292, 1294 (Fla. Dist. Ct. App. 1983)).  Thus, the court held that "commercial bribery harms an employer as a matter of law, and the proper measure of damages suffered must include at a minimum the amount of the commercial bribe the third party paid."  Id.  The court in Williams reached the same result.  366 F.3d at 576.  It found the employer is harmed by the amount of the bribe because the bribe is "an additional expense to the person whose agent was bribed."  Id. The third party paying the bribe to the employee is presumed to increase the price charged to the employer in order to cover the cost of the bribe because "no one would pay a bribe who didn't anticipate garnering net additional revenue at least equal to the amount of the bribe."  Id.   Here, the bribed individuals, the insurance agents, are neither employees nor agents of Safelite.  Rather, they are agents of the insurance companies.  Thus, while Diamond's bribes harmed the policyholders and the insurance companies because we may presume Diamond increased its prices to cover the cost of the gift program, Safelite was not a party to any transaction with Diamond wherein it could allay its costs.  Therefore, we cannot use the amount of the bribes as a measure of the Safelite's damages.

lost profits claim.  Therefore, we will dismiss Counts I, II, and V, and Counts III and IV will proceed to trial.

As to the counterclaims, we will grant summary judgment on Counterclaim III,  the Robinson-Patman claim, but deny the motion for summary judgment as to the remaining claims.  An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DIAMOND TRIUMPH AUTO** | : | **No. 3:02cv514** |
| **GLASS, INC.,** | : | |
| **Plaintiff** | : | **(Judge Munley)** |
| **v.** | : | |
| | : | |
| **SAFELITE GLASS CORPORATION,** | : | |
| **Defendant** | : | |

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## <u>ORDER</u>

**AND NOW**, to wit, this 31st day of July 2006, it is hereby **ORDERED** that:

1) Defendant Safelite's Motion for Summary Judgment (Doc. 359) is **GRANTED** in part and **DENIED** in part.  Summary Judgment is granted on: Count I, breach of contract; Count II, state deceptive trade practices; and Count V, Lanham Act.  We grant summary judgment on Count IV, disparagement, to the extent this claim is based on the truthful scripted warnings, as discussed in the above memorandum.  We grant summary judgment on Count III, tortious interference with business relationships, to the extent this claim is based on the truthful scripted warnings or Diamond's prospective relationship with policyholders who merely called the network and expressed a preference for Diamond.  Summary judgment is denied in all other respects.

2) Defendant Diamond Triumph's Motion for Summary Judgment (Doc. 361) is **GRANTED** in part and **DENIED** in part.  We grant summary judgment on Count III, Robinson-Patman Act, and deny summary judgment in all other respects.

3) Defendant Diamond Triumph's Motion to Exclude the Opinion of Phillip Beutel for Summary Judgment Purposes (Doc. 406) is hereby **DENIED**.

4)  Defendant Safelite's Motion to Exclude the Opinion of Barbara Kahn for Summary Judgment Purposes (Doc. 408) is hereby **DENIED** as moot.

5)    Defendant Safelite's Motion to Exclude the Opinion of Joseph Kenyon  for Summary Judgment Purposes (Doc. 410) is hereby **DENIED** as moot.


6)    Defendant Diamond Triumph's Motion to Exclude the Opinion of Eugene Erickson's for Summary Judgment Purposes (Doc. 407) is hereby **DENIED** as moot.

**BY THE COURT:**

**s/ James M. Munley**
**JUDGE JAMES M. MUNLEY**
**United States District Court**